## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

*In Re Union Home Mortgage Corp.*
*Data Breach Litigation*

Case No.: 1:25-cv-1874

### CONSOLIDATED CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

Plaintiffs Jed Rudd, Mason Fink, Victor DiMarco, Francis Peters, Jeremy McMullen, Jacquelyne Washington, Josiah Florczykowski, Barry Contee, Michael Eils, Ikaika San Nicolas, Dillon Dowell, Charles Burrows, Codey Christopherson, and Tawana Whigham (collectively, "Plaintiffs"), through their attorneys, individually and on behalf of all others similarly situated, bring this Consolidated Class Action Complaint against Union Home Mortgage, Corp. ("Defendant" or "UHMC"). Plaintiffs allege the following upon personal knowledge as to their own acts, counsels' investigation, facts of public record, and information and belief as to all other matters.

### INTRODUCTION

1.     Plaintiffs and the proposed Class Members bring this class action lawsuit on behalf of all persons who entrusted Defendant with sensitive personally identifiable information ("PII"[1] or "Private Information) and that was impacted in a cyber incident (the "Data Breach" or the "Breach").

2.     Plaintiffs' claims arise from Defendant's failure to properly secure and safeguard Private Information that was entrusted to it, and its accompanying responsibility to store and

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

transfer that information.

3.      Defendant is a privately held American mortgage lending company founded in 1970, based in Strongsville, Ohio.

4.      Defendant is a mortgage lender that operates in 48 states, and the District of Columbia.[2] Its annual lending volume is $5 billion.[3]

5.      On June 25, 2025, Defendant learned that an unauthorized third-party accessed its IT Network.[4] In response, Defendant launched an investigation to determine the nature and scope of the Data Breach.[5]

6.      On August 26, 2025, Defendant learned that Private Information contained in its IT Network was accessed by the unauthorized third-party.[6]

7.      Upon information and belief, the following types of Private Information were exposed as a result of the Data Breach: names, loan numbers, Social Security numbers, driver's license or government-issued ID card numbers, or dates of birth.[7]

8.      On August 29, 2025—two months after Defendant was made aware of the Data Breach—Defendant issued a public disclosure about the Data Breach and began sending notice letters (the "Notice") to impacted individuals.

9.      Defendant failed to take precautions designed to keep individuals' Private Information secure.

---

[2] *Our Story*, Union Home Mortgage, https://www.uhm.com/our-story/ (last visited Nov. 3, 2025).

[3] *Id.*

[4] *See* Union Home Mortgage Corp., *Notice of Data Security Incident*, Mont. Dep't of Justice Off. of Consumer Protection (Sept. 11, 2025), https://dojmt.gov/wp-content/uploads/2025/09/Consumer-notification-letter-34.pdf (last visited Nov. 3, 2025).

[5] *Id.*

[6] *Id.*

[7] *Id.*

10.     Defendant owed Plaintiffs and Class Members a duty to take all reasonable and necessary measures to keep the Private Information collected safe and secure from unauthorized access. Defendant solicited, collected, used, and derived a benefit from the Private Information, yet breached its duty by failing to implement or maintain adequate security practices.

11.     Defendant admits that information in its system was accessed by unauthorized individuals, though it provided little information regarding how the Data Breach occurred.

12.     The sensitive nature of the data exposed through the Data Breach signifies that Plaintiffs and Class Members have suffered irreparable harm. Plaintiffs and Class Members have lost the ability to control their Private Information and are subject to an increased risk of identity theft.

13.     Defendant, despite having the financial wherewithal and personnel necessary to prevent the Data Breach, nevertheless failed to use reasonable security procedures and practice appropriate to the nature of the sensitive, unencrypted information it maintained for Plaintiffs and Class Members, causing the exposure of Plaintiffs' and Class Members' Private Information.

14.      The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect Plaintiffs' and Class Members' Private Information from a foreseeable and preventable cyber-attack. Defendant could have prevented or mitigated the consequences of the Data Breach by limiting access to sensitive information to only necessary employees, requiring multi-factor authentication to verify access credentials, encrypting data at rest and in transit, monitoring its systems for signs of unusual activity or the transfer of large volumes of data, and regularly rotating passwords.

15.     As a result of Defendant's inadequate digital security and notice process, Plaintiffs' and Class Members' Private Information was exposed to criminals. Plaintiffs and the

Class Members have suffered and will continue to suffer injuries including: financial losses caused by misuse of their Private Information; the loss or diminished value of their Private Information as a result of the Data Breach; lost time associated with detecting and preventing identity theft; and theft of personal and financial information.

16.     Defendant was and is well aware that it is at high risk of attempted cyberattack due to the high value of the sensitive data.

17.     Despite Defendant's awareness of both the value and sensitivity of the data it safeguarded and serious risk presented by insufficient security practices, Defendant did not take sufficient steps to ensure that its systems were secure. Defendant knew or should have known about the risks to the data it stored and processed, and the critical importance of adequate security measures in the face of increasing threats.

18.     Plaintiffs bring this action on behalf of all persons whose Private Information was compromised as a result of Defendant's failure to: (i) adequately protect the Private Information of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of Defendant's inadequate information security practices; (iii) effectively secure hardware containing protected Private Information using reasonable and adequate security procedures free of vulnerabilities and incidents; and (iv) timely notify Plaintiffs and Class Members of the Data Breach. Defendant's conduct amounts to at least negligence and violates federal and state statutes.

19.     Plaintiffs bring this action individually and on behalf of a Class of similarly situated individuals against Defendant for: negligence; breach of implied contract; unjust enrichment, and declaratory judgment and injunctive relief. Additionally, Plaintiffs Peters and San Nicolas bring a claim for violation of the California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.150, *et seq.*, on behalf of the California Subclass; and Plaintiff Dowell brings a

claim for violation of the North Carolina Deceptive and Unfair Trade Practices Act ("NCDUTPA"), N.C. Gen. Stat. An. § 75-1.1, *et seq*., on behalf of the North Carolina Subclass.

20.    Plaintiffs seek to remedy these harms and prevent any future data compromise on behalf of themselves, and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

## THE PARTIES

### The Plaintiffs

### Plaintiff Jed Rudd

21.    Plaintiff Rudd is an adult individual and a natural person, citizen of Texas, residing in Parker County, where he intends to stay.

22.    Plaintiff Rudd was an employee of Defendant. He provided his Private Information to Defendant as a condition of receiving employment. Upon information and belief, Plaintiff Rudd's Private Information was stored and maintained by Defendant.

23.    Plaintiff Rudd received a notice letter from Defendant dated August 29, 2025, informing him of the Data Breach and the exposure of his Private Information.

24.    The notice letter informed Plaintiff Rudd that his Social Security number, date of birth, address, passport number, driver's license, state identification number, and name were potentially compromised in the Data Breach.

### Plaintiff Mason Fink

25.    Plaintiff Fink is an adult individual and a natural person, and a citizen of Ohio, residing in Cuyahoga County, where he intends to stay.

26.    Plaintiff Fink, a current customer of Defendant, provided his Private Information

to Defendant as a condition of receiving a mortgage or loan. Upon information and belief, Plaintiff Fink's Private Information was stored and maintained by Defendant.

27. Following Defendant's discovery of the June 25, 2025 Data Breach, Plaintiff Fink received a notice letter from Defendant informing him of the Data Breach and the exposure of his Private Information.

28. The notice letter informed Plaintiff Fink that his Social Security number, date of birth, address, passport number, driver's license, state identification number, and name were potentially compromised in the Data Breach.

### *Plaintiff Victor DiMarco*

29. Plaintiff DiMarco is an adult individual and a natural person, citizen of Ohio, residing in Summit County, where he intends to stay.

30. Plaintiff DiMarco was a prospective customer of Defendant. He contacted Defendant to received information about financing for his house, but never obtained financing. He provided his Private Information to Defendant as a condition of applying for financing for his home. Upon information and belief, Plaintiff DiMarco's Private Information was stored and maintained by Defendant.

31. Following Defendant's discovery of the June 25, 2025 Data Breach, Plaintiff DiMarco received a notice letter from Defendant informing him of the Data Breach and the exposure of his Private Information.

32. The notice letter informed Plaintiff DiMarco that his Social Security number, date of birth, address, passport number, driver's license, state identification number, and name were potentially compromised in the Data Breach.

***Plaintiff Francis Peters***

33.     Plaintiff Peters is an adult individual and a natural person, citizen of California, residing in San Diego County, where he intends to stay.

34.     Plaintiff Peters, a former customer of Defendant, provided his Private Information to Defendant as a condition of receiving a mortgage or loan. Upon information and belief, Plaintiff Peters' Private Information was stored and maintained by Defendant.

35.     Plaintiff Peters received a notice letter from Defendant dated September 15, 2025, informing him of the Data Breach and the exposure of his Private Information.

36.     The notice letter informed Plaintiff that his Social Security number, date of birth, address, passport number, driver's license, state identification number, and name were potentially compromised in the Data Breach.

***Plaintiff Jeremy McMullen***

37.     Plaintiff McMullen is an adult individual and a natural person, citizen of Michigan, residing in Gratiot County, where he intends to stay.

38.     Plaintiff McMullen was never a customer of Defendant. Rather, he provided his Private Information to his bank as a condition of receiving a bank issued mortgage or loan. Plaintiff is unsure if his bank was acquired by Defendant.

39.     Following Defendant's discovery of the June 25, 2025 Data Breach, Plaintiff McMullen received a notice letter from Defendant informing him of the Data Breach and the exposure of his Private Information.

40.     The notice letter informed Plaintiff McMullen that his Social Security number, date of birth, address, passport number, driver's license, state identification number, and name were potentially compromised in the Data Breach.

### Plaintiff Jacquelyne Washington

41.  Plaintiff Washington is an adult individual and a natural person, citizen of Ohio, residing in Hamilton County, where she intends to stay.

42.  Plaintiff Washington was a prospective customer of Defendant. She contacted Defendant to receive information about a mortgage but never obtained a mortgage. She provided Private Information to Defendant as a condition of receiving information about a mortgage. Upon information and belief, Plaintiff Washington's Private Information was stored and maintained by Defendant.

43.  Following Defendant's discovery of the June 25, 2025 Data Breach, Plaintiff Washington received a notice letter from Defendant informing her of the Data Breach and the exposure of her Private Information.

44.  The notice letter informed Plaintiff Washington that her Social Security number, date of birth, address, passport number, driver's license, state ID number, and name were potentially compromised in the Data Breach.

### Plaintiff Josiah Florczykowsi

45.  Plaintiff Florcyzkowsi is an adult individual and a natural person, citizen of Texas, residing in Bell County, where he intends to stay.

46.  Plaintiff Florcyzkowsi, as a current customer of Defendant, provided his Private Information to Defendant as a condition of receiving a mortgage or loan. Upon information and belief, Plaintiff Florcyzkowsi's Private Information was stored and maintained by Defendant.

47.  Following Defendant's discovery of the June 25, 2025 Data Breach, Plaintiff Florcyzkowsi received a notice letter from Defendant informing him of the Data Breach and the exposure of his Private Information.

48.     The notice letter informed Plaintiff Florcyzkowsi that his Social Security number, date of birth, address, passport number, driver's license, state identification number, and name were potentially compromised in the Data Breach.

### Plaintiff Barry Contee

49.     Plaintiff Contee is an adult individual and a natural person, citizen of Florida, residing in Collier County, where he intends to stay.

50.     Plaintiff Contee, as a current customer of Defendant, provided his Private Information to Defendant as a condition of receiving a mortgage or loan. Upon information and belief, Plaintiff Contee's Private Information was stored and maintained by Defendant.

51.     Following Defendant's discovery of the June 25, 2025 Data Breach, Plaintiff Contee received a notice letter from Defendant informing him of the Data Breach and the exposure of his Private Information.

52.     The notice letter informed Plaintiff Contee that his Social Security number, date of birth, address, passport number, driver's license, state identification number, and name were potentially compromised in the Data Breach.

### Plaintiff Michael Eils

53.     Plaintiff Eils is an adult individual and a natural person, citizen of South Carolina, residing in Horry County, where he intends to stay.

54.     Plaintiff Eils was never a customer of Defendant. He purchased a home in 2019, and refinanced his mortgage with Success Mortgage Partners, Inc. in 2021. He provided his Private Information to Success Mortgage Partners, Inc. as a condition of refinancing his mortgage. Success Mortgage Partners, Inc. sold his loan to Defendant, who then sold his loan to JP Morgan

Chase Bank. Upon information and belief, Plaintiff Eils's Private Information was stored and maintained by Defendant.

55.     Plaintiff Eils received a notice letter from Defendant dated September 15, 2025, informing him of the Data Breach and the exposure of his Private Information.

56.     The notice letter informed Plaintiff Eils that his Social Security number, date of birth, address, passport number, driver's license, state identification number, and name were potentially compromised in the Data Breach.

### Plaintiff Ikaika San Nicolas

57.     Plaintiff Ikaika Sebastian San Nicolas is an adult individual and a natural person, citizen of California, residing in Alameda County, where he intends to stay.

58.     Plaintiff San Nicolas, a former prospective customer of Defendant, provided his Private Information to Defendant as a condition of applying for a mortgage or loan. Upon information and belief, Plaintiff San Nicolas' Private Information was stored and maintained by Defendant.

59.     Following Defendant's discovery of the June 25, 2025 Data Breach, Plaintiff San Nicolas received a notice letter from Defendant informing him of the Data Breach and the exposure of his Private Information.

60.     The notice letter informed Plaintiff San Nicolas that his Social Security number, date of birth, address, passport number, driver's license, state identification number, and name were potentially compromised in the Data Breach.

### Plaintiff Dillon Dowell

61.     Plaintiff Dowell is an adult individual and a natural person, and a citizen of North Carolina, residing in Person County, where he intends to stay.

62.     Plaintiff Dowell, a current customer of Defendant, provided his Private Information to Defendant as a condition of receiving a mortgage or loan. Upon information and belief, Plaintiff's Private Information was stored and maintained by Defendant.

63.     Following Defendant's discovery of the June 25, 2025 Data Breach, Plaintiff Dowell received a notice letter from Defendant informing him of the Data Breach and the exposure of his Private Information.

64.     The notice letter informed Plaintiff Dowell that his Social Security number, date of birth, address, passport number, driver's license, state identification number, and name were potentially compromised in the Data Breach.

### *Plaintiff Charles Burrows*

65.     Plaintiff Burrows is an adult individual and a natural person, citizen of Ohio, residing in Cuyahoga County, where he intends to stay.

66.     Plaintiff Burrows, a current customer of Defendant, provided his Private Information to Defendant as a condition of receiving a mortgage or loan. Upon information and belief, Plaintiff Burrows's Private Information was stored and maintained by Defendant.

67.     Plaintiff Burrows received a notice letter from Defendant dated September 15, 2025, informing her of the Data Breach and the exposure of his Private Information.

68.     The notice letter informed Plaintiff Burrows that his Social Security number, date of birth, address, passport number, driver's license, state identification number, and name were potentially compromised in the Data Breach.

### *Plaintiff Codey Christopherson*

69.     Plaintiff Christopherson is an adult individual and a natural person, citizen of Wisconsin, residing in La Crosse County, where he intends to stay.

70.     Plaintiff Christopherson, a current customer of Defendant, provided his Private Information to Defendant as a condition of receiving a mortgage or loan. Upon information and belief, Plaintiff Christopherson's Private Information was stored and maintained by Defendant.

71.     Plaintiff Burrows received a notice letter from Defendant dated September 15, 2025, informing her of the Data Breach and the exposure of his Private Information.

72.     The notice letter informed Plaintiff Burrows that his Social Security number, date of birth, address, passport number, driver's license, state identification number, and name were potentially compromised in the Data Breach.

### Plaintiff Tawana Whigham

73.     Plaintiff Whigham is an adult individual and a natural person, citizen of Ohio, residing in Hamilton County, where she intends to stay.

74.     Plaintiff Whigham, a former customer of Defendant, provided her Private Information to Defendant as a condition of receiving a mortgage or loan. Upon information and belief, Plaintiff Whigham's Private Information was stored and maintained by Defendant.

75.     Plaintiff Whigham received a notice letter from Defendant dated September 15, 2025, informing her of the Data Breach and the exposure of her Private Information.

76.     The notice letter informed Plaintiff Whigham that her Social Security number, date of birth, address, passport number, driver's license, state identification number, and name were potentially compromised in the Data Breach.

### Defendant Union Home Mortgage, Corp.

77.     Defendant is an Ohio corporation, whose principal place of business is located at 8241 Dow Circle West, Strongsville, Ohio, 44136.

## JURISDICTION AND VENUE

78.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. At least one Class Member is diverse from Defendant, including Plaintiff Dowell, and there are over 100 putative Class Members. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

79.     This Court has personal jurisdiction over Defendant because Defendant is incorporated under the laws of Ohio, and is headquartered and regularly conducts business in this State, and thus, has sufficient minimum contacts with this State. Defendant intentionally avails itself of the markets within this State to render the exercise of jurisdiction by this Court just and proper.

80.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. Defendant is also based in this District, maintains Plaintiffs' and Class Members' PII in this District, and has caused harm to Plaintiffs and Class Members from or within this District.

## FACTUAL ALLEGATIONS

### A. Background on Defendant

81.     Defendant is a privately-held American mortgage lending company founded in 1970, based in Strongsville, Ohio.

82.     Defendant "has guided hundreds of thousands of aspiring homebuyers through the process of achieving homeownership."[8]

83.     Defendant offers conventional home loans, refinancing, FHA loans, VA loans,

---

[8] *Our Story*, Union Home Mortgage Corp., https://www.uhm.com/our-story/ (last visited Oct. 28, 2025).

USDA loans, rehab loans, new home construction loans, and home and auto insurance.[9]

84.     Defendant represents itself as a "world-class company where people come first" and has an annual lending volume of over $5 billion.[10]

85.     Defendant has over 155 branch locations in 48 states and the District of Columbia.[11]

86.     Defendant, in the regular course of its business, collects and maintains the Private Information of employees, applicants, and home buyers as a requirement of its business practices.

87.     Defendant claims to take its "clients['] financial privacy very seriously."[12]

88.     Defendant "accumulate[s] non-public personal financial information from you and from other sources about your income, your assets, and your credit history in order to allow a lender to make an informed decision about granting you credit."[13]

89.     Defendant claims to "restrict access to nonpublic personal information about you to those employees who need to know that information to provide products or services to you"[14] and to "maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information."[15]

90.     Defendant claims that "[w]e employ industry recognized security safeguards to help protect the personally identifiable information that you have provided to us from loss,

---

[9] Union Home Mortgage Corp. Home Page, https://www.uhm.com (last visited Nov. 3, 2025).

[10] *Id.*

[11] Union Home Mortgage Corp., *Who Is Union Home Mortgage: Branches Across the Nation*, https://www.uhm.com/about-us/  (last visited Nov. 3, 2025).

[12] *Privacy Policy*, Union Home Mortgage Corp. (Aug. 2024), https://www.uhm.com/privacy-policy/ (last visited Nov. 3, 2025).

[13] *Id.*

[14] *Id.*

[15] *Id.*

misuse, or unauthorized alteration. To protect you we have deployed modern encryption protocols with industry accepted cipher strengths."[16]

91.     Plaintiffs and Class Members provided their Private Information to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

92.     As a result of collecting and storing the Private Information of Plaintiffs and Class Members for its own financial benefit, Defendant had a continuous duty to adopt and employ reasonable measures to protect Plaintiffs' and the Class Members' Private Information from disclosure to third parties.

93.     Consumers, in general, demand that businesses that require highly sensitive Private Information will provide security to safeguard their PII, especially when Social Security numbers are involved.

94.     In the course of their dealings, Plaintiffs and Class Members provided Defendant with all or most of the following types of Private Information:

        a.   First and last names;

        b.   Home addresses;

        c.   Dates of birth;

        d.   Financial information;

        e.   Photo identification and/or driver's licenses;

        f.   Email addresses;

        g.   Phone numbers; and

        h.   Social Security numbers.

---

[16] *Id.*

**B. The Data Breach**

95.     On June 25, 2025, Defendant learned that an unauthorized third-party accessed its IT Network.[17] In response, Defendant launched an investigation to determine the nature and scope of the Data Breach.[18]

96.     On August, 26, 2025, Defendant learned that Private Information contained in its IT Network was accessed by the unauthorized third-party.[19]

97.     Defendant has disclosed the following types of Private Information were exposed as a result of the Data Breach: name, Social Security number, home address, date of birth, driver's license/state ID, and/or passport.[20] Upon information and belief, email addresses and phone numbers were also exposed, given that this data is commonly included in the same files that contain other PII.

98.     On or after August 26, 2025—two months after Defendant was made aware of the Data Breach—Defendant issued a public disclosure about the Data Breach and began sending Notice to impacted individuals.[21]

99.     Time is of the essence when trying to protect against identity theft after a data breach, so early notification is critical.

100.    On or around September 11, 2025, Defendant reported to the Washington State Office of the Attorney General that 1,650 Washingtonians were affected.[22]

---

[17] *See, e.g.,* https://dojmt.gov/wp-content/uploads/2025/09/Consumer-notification-letter-34.pdf, *supra*, n.4.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id*.

[22] *Data Breach Notifications Directory*, Wash. State Off. of the Atty. Gen., https://www.atg.wa.gov/data-breach-notifications (last visited Nov. 3, 2025).

101.　On or around September 12, 2025, Defendant reported to the Texas Office of the Attorney General that 24,160 Texans were impacted by the Data Breach.[23]

102.　The Data Breach Notices do not provide details about the root cause of the Data Breach, the vulnerabilities exploited, the criminals responsible for the breach, and the remedial measures undertaken to ensure such a breach does not occur again. To date, Defendant has not explained or disclosed these facts to Plaintiffs and Class Members.

103.　Without these details, Plaintiffs' and Class Members' ability to mitigate harms resulting from the Data Breach is severely diminished.

104.　Defendant's Data Breach notice offers no substantive steps to help victims like Plaintiffs and Class Members to protect themselves other than providing temporary, non-automatic credit monitoring and identity protection, which is woefully inadequate considering the lifelong increased risk of fraud and identity theft that Plaintiffs and Class Members now face as a result of the Data Breach.

105.　Defendant has offered affected individuals abbreviated, non-automatic credit monitoring.[24] These limitations are inadequate when the victims will likely face many years of identity theft.

106.　Moreover, Defendant's credit monitoring offer and advice to Plaintiffs and Class Members squarely place the burden on Plaintiffs and Class Members, rather than on Defendant, to monitor and report suspicious activities to law enforcement. In other words, Defendant expects Plaintiffs and Class Members to protect themselves from its tortious acts resulting from the Data Breach. Rather than automatically enrolling Plaintiffs and Class Members in credit monitoring

---

[23] *Data Security Breach Reports*, Tex. Off. of the Atty. Gen., https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage  (last visited Nov. 3, 2025).

[24] *See* https://dojmt.gov/wp-content/uploads/2025/09/Consumer-notification-letter-34.pdf, *supra*, n.4.

services upon discovery of the Data Breach, Defendant merely sent instructions to Plaintiffs and Class Members about actions they could affirmatively take to protect themselves.

107.    Defendant failed to take precautions designed to keep individuals' Private Information secure.

108.    While Defendant sought to minimize the damage caused by the Data Breach, it cannot and has not denied that there was unauthorized access to the sensitive Private Information of Plaintiffs and Class Members.

109.    Individuals affected by the Data Breach are, and remain, at risk that their data will be sold or listed on the dark web and, ultimately, illegally used in the future.

**C. Defendant Knew—or Should Have Known—of the Risk of a Data Breach**

110.    It is well known that Private Information is an invaluable commodity and a frequent target of hackers.

111.    Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years. In light of past high profile data breaches at industry-leading companies, including, for example, T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), Defendant knew or, if acting as a reasonable business, should have known that the Private Information it collected and maintained would be vulnerable to and targeted by cybercriminals.

112.    In 2024, a 3,158 data breaches occurred, exposing approximately 1,350,835,988

sensitive records—a 211% increase year-over-year.[25]

113.    Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.[26]

114.    Additionally, as companies became more dependent on computer systems to run their business,[27] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[28]

115.    Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and Defendant.

116.    Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep Private Information private and secure, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

117.    This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that (i) ransomware actors were targeting entities

---

[25] *2024 Data Breach Report*, 6, Identity Theft Resource Center (Jan. 2025), https://www.idtheftcenter.org/publication/2024-data-breach-report/  (last visited Nov. 3, 2025).

[26] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware  (last visited Nov. 3, 2025).

[27] Danny Brando, *et al.*, *Implications of Cyber Risk for Financial Stability*, FEDS Notes (May 12, 2022), https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html  (last visited Nov. 3, 2025).

[28] Suleyman Ozarslan, *Financial Services and Banking Firms in 2022*, PicusLabs (Mar. 24, 2022), https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022  (last visited Nov. 3, 2025).

such as Defendant, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Defendant, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included extortion and threatening to release stolen data.

118.    In light of the information readily available and accessible before the Data Breach, Defendant, knew or should have known that there was a foreseeable risk that Plaintiffs' and Class Members' Private Information could be accessed, exfiltrated, and published as the result of a cyberattack. Data breaches are so prevalent in today's society therefore making the risk of experiencing a data breach entirely foreseeable to Defendant.

119.    Defendant failed to abide by its own Privacy Policy.[29]

### D. Defendant's Failure to Prevent, Identify, and Timely Report the Data Breach

120.    Defendant admits that an unauthorized third party accessed IT Network. Defendant failed to take adequate measures to protect its computer systems against unauthorized access.

121.    The Private Information that Defendant allowed to be exposed in the Data Breach is the type of private information that Defendant knew or should have known would be the target of cyberattacks.

122.    Despite its own knowledge of the inherent risks of cyberattacks, and notwithstanding the Federal Trade Commission's ("FTC") data security principles and practices,[30] Defendant failed to disclose that its systems and security practices were inadequate to reasonably safeguard Plaintiffs' and Class Members' Private Information.

123.    At all relevant times, Defendant had a duty to Plaintiffs and Class Members to

---

[29] *Privacy Policy*, https://www.uhm.com/privacy-policy, *supra*, n.12.

[30] *Protecting Personal Information: A Guide for Business,* FTC (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Nov. 3, 2025).

properly secure their Private Information, encrypt and maintain such information using industry standard methods, train its employees, utilize available technology to defend its systems from invasion, act reasonably to prevent foreseeable harm to Plaintiffs and Class Members, and to promptly notify Plaintiffs and Class Members when Defendant became aware that their Private Information was compromised.

124.     Defendant had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect such information. Accordingly, Defendant breached its common law, statutory, and other duties owed to Plaintiffs and Class Members.

125.     Security standards commonly accepted among businesses that store Private Information using the internet include, without limitation:

  a.   Maintaining a secure firewall configuration;

  b.   Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

  c.   Monitoring for suspicious or irregular traffic to servers;

  d.   Monitoring for suspicious credentials used to access servers;

  e.   Monitoring for suspicious or irregular activity by known users;

  f.   Monitoring for suspicious or unknown users;

  g.   Monitoring for suspicious or irregular server requests;

  h.   Monitoring for server requests for PII;

  i.   Monitoring for server requests from VPNs; and

  j.   Monitoring for server requests from Tor exit nodes.

126.     The FTC directs businesses to use an intrusion detection system to expose a breach

21

as soon as it occurs, monitor activity for attempted hacks, and have an immediate response plan if a breach occurs.[31] Immediate notification of a Data Breach is critical so that those impacted can take measures to protect themselves.

### E.  Plaintiffs' Experience and Injuries

***Plaintiff Rudd's Experience***

127.    Plaintiff Rudd values his privacy and makes every effort to keep his personal information private.

128.    Plaintiff Rudd only allowed Defendant to maintain, store, and use his Private Information because he believed that Defendant would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information.

129.    In the instant that Plaintiff Rudd's Private Information was accessed and obtained by a third party without his consent or authorization, Plaintiff suffered injury from a loss of privacy.

130.    Plaintiff Rudd has been further injured by the damages to and diminution in value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff was deprived of when his Private Information was placed on a publicly accessible database, exfiltrated by cybercriminals.

131.    Plaintiff Rudd's Private Information has already been stolen and misused as he has experienced incidents of fraud and identity theft so far in the form of having his information shared on the dark web. These actions by unauthorized criminal third parties have detrimentally impacted Plaintiff's life as a whole and specifically caused financial strain on him as a direct result of the Data Breach.

---

[31] *Id.*

132.    Furthermore, Plaintiff Rudd has experienced increased spam calls and several spam text messages a day as a result of the Data Breach.

133.    The Data Breach has also caused Plaintiff Rudd to suffer imminent and impending injury arising from the present and substantially increased risk of future fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

134.    As a result of the actual harm, Plaintiff Rudd has suffered and the present and increased imminent risk of future harm, Plaintiff has lost time researching and investigating the breach, monitoring his financial accounts for fraudulent activity, freezing his credit card, and contacting the credit card company to remedy fraudulent charges on his credit card that occurred after the Data Breach.

135.    In addition to the increased risk and the actual harm suffered, the Data Breach has caused Plaintiff Rudd to spend significant time dealing with issues related to the Data Breach, which includes time spent continuously monitoring his financial accounts for continued fraudulent activity. This time, which has been lost forever and cannot be recaptured, was spent at Defendant's direction.

136.    The present and substantial risk of imminent harm and loss of privacy have both caused Plaintiff Rudd to suffer stress and anxiety stemming from constant worry of fraud. This heightened fear of fraud has caused Plaintiff to increase caution with use of his credit cards and financial accounts.

137.    Plaintiff Rudd has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

*Plaintiff Fink's Experience*

138.    Plaintiff Fink values his privacy and makes every effort to keep his personal information private.

139.    Plaintiff Fink only allowed Defendant to maintain, store, and use his Private Information because he believed that Defendant would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information.

140.    In the instant that Plaintiff Fink's Private Information was accessed and obtained by a third party without his consent or authorization, Plaintiff suffered injury from a loss of privacy.

141.    Plaintiff Fink has been further injured by the damages to and diminution in value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff was deprived of when his Private Information was placed on a publicly accessible database, exfiltrated by cybercriminals.

142.    Plaintiff Fink's Private Information has already been stolen and misused as he has experienced incidents of fraud and identity theft so far in the form of having his information shared on the dark web. These actions by unauthorized criminal third parties have detrimentally impacted Plaintiff's life as a whole.

143.    Furthermore, Plaintiff Fink has experienced increased spam calls, spam text messages, and has received notifications that his confidential information was shared on the dark web as a result of the Data Breach.

144.    The Data Breach has also caused Plaintiff Fink to suffer imminent and impending injury arising from the present and substantially increased risk of future fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

145. As a result of the actual harm Plaintiff Fink has suffered and the present and increased imminent risk of future harm, Plaintiff has time researching and investigating card fraud alerts, reading news about the Data Breach, and communicating with attorneys.

146. In addition to the increased risk and the actual harm suffered, the Data Breach has caused Plaintiff Fink to spend significant time dealing with issues related to the Data Breach, which includes time spent continuously monitoring his financial accounts for continued fraudulent activity. This time, which has been lost forever and cannot be recaptured, was spent at Defendant's direction.

147. The present and substantial risk of imminent harm and loss of privacy have both caused Plaintiff Fink to suffer stress and fear.

148. Plaintiff Fink has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

### Plaintiff DiMarco's Experience

149. Plaintiff DiMarco values his privacy and makes every effort to keep his personal information private.

150. Plaintiff DiMarco only allowed Defendant to maintain, store, and use his Private Information because he believed that Defendant would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information.

151. In the instant that Plaintiff DiMarco's Private Information was accessed and obtained by a third party without his consent or authorization, Plaintiff suffered injury from a loss of privacy.

152.    Plaintiff DiMarco has been further injured by the damages to and diminution in value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff was deprived of when his Private Information was placed on a publicly accessible database, exfiltrated by cybercriminals.

153.    Plaintiff DiMarco's Private Information has already been stolen and misused as he has experienced incidents of fraud and identity theft so far in the form of having his information shared on the dark web. These actions by unauthorized criminal third parties have detrimentally impacted Plaintiff's life as a whole.

154.    Furthermore, Plaintiff DiMarco has experienced increased spam calls, spam text messages, and received notifications that his confidential information was posted on the dark web as a result of the Data Breach.

155.    The Data Breach has also caused Plaintiff DiMarco to suffer imminent and impending injury arising from the present and substantially increased risk of future fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

156.    As a result of the actual harm Plaintiff DiMarco has suffered and the present and increased imminent risk of future harm, Plaintiff has lost time reviewing bills and accounts, exploring credit protections options, and closing credit cards.

157.    In addition to the increased risk and the actual harm suffered, the Data Breach has caused Plaintiff DiMarco to spend significant time dealing with issues related to the Data Breach, which includes time spent verifying the legitimacy of the Data Breach Notice Letter, and self-monitoring his accounts to ensure no fraudulent activity has occurred. This time, which has been lost forever and cannot be recaptured, was spent at Defendant's direction.

158.    The present and substantial risk of imminent harm and loss of privacy have both

caused Plaintiff DiMarco to suffer stress, fear, and anxiety.

159.    Plaintiff DiMarco has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

### Plaintiff Peters' Experience

160.    Plaintiff Peters values his privacy and makes every effort to keep his personal information private.

161.    Plaintiff Peters only allowed Defendant to maintain, store, and use his Private Information because he believed that Defendant would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information.

162.    In the instant that Plaintiff Peters' Private Information was accessed and obtained by a third party without his consent or authorization, Plaintiff suffered injury from a loss of privacy.

163.    Plaintiff Peters has been further injured by the damages to and diminution in value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff was deprived of when his Private Information was placed on a publicly accessible database, exfiltrated by cybercriminals.

164.    Plaintiff Peters' Private Information has already been stolen and misused as he has experienced incidents of fraud and identity theft so far in the form of having his information shared on the dark web. These actions by unauthorized criminal third parties have detrimentally impacted Plaintiff's life as a whole.

165.    Furthermore, Plaintiff Peters has experienced increased spam calls, spam text messages, calls and texts related to medical appointments with unfamiliar doctors, and received

notifications that his confidential information was posted on the dark web as a result of the Data Breach.

166.    The Data Breach has also caused Plaintiff Peters to suffer imminent and impending injury arising from the present and substantially increased risk of future fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

167.    As a result of the actual harm, Plaintiff Peters has suffered and the present and increased imminent risk of future harm. Plaintiff has lost time researching and investigating the breach. Plaintiff has spent time changing passwords, sorting and deleting spam, and blocking spam numbers.

168.    In addition to the increased risk and the actual harm suffered, the Data Breach has caused Plaintiff Peters to spend significant time dealing with issues related to the Data Breach, which includes time spent verifying the legitimacy of the Data Breach Notice Letter, and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. This time, which has been lost forever and cannot be recaptured, was spent at Defendant's direction.

169.    The present and substantial risk of imminent harm and loss of privacy have both caused Plaintiff Peters to suffer stress, fear, anxiety, and frustration.

170.    Plaintiff Peters has a continuing interest in ensuring that Plaintiff's Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

***Plaintiff McMullen's Experience***

171.    Plaintiff McMullen values his privacy and makes every effort to keep his personal information private.

172.    Plaintiff McMullen only allowed Defendant to maintain, store, and use his Private

Information because he believed that Defendant would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information.

173.    In the instant that Plaintiff McMullen's Private Information was accessed and obtained by a third party without his consent or authorization, Plaintiff suffered injury from a loss of privacy.

174.    Plaintiff McMullen has been further injured by the damages to and diminution in value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff was deprived of when his Private Information was placed on a publicly accessible database, exfiltrated by cybercriminals.

175.    Plaintiff McMullen's Private Information has already been stolen and misused as he has experienced incidents of fraud and identity theft so far in the form of unauthorized withdrawals from his bank account and unauthorized credit card charges after the Data Breach, and having his information shared on the dark web. These actions by unauthorized criminal third parties have detrimentally impacted Plaintiff's life as a whole and specifically caused financial strain on him as a direct result of the Data Breach.

176.    Furthermore, Plaintiff McMullen has experienced increased spam calls, spam text messages, received notifications after the Data Breach that his confidential information was posted on the dark web, and received alerts from a credit monitoring service, as a result of the Data Breach.

177.    The Data Breach has also caused Plaintiff McMullen to suffer imminent and impending injury arising from the present and substantially increased risk of future fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

178.    As a result of the actual harm Plaintiff McMullen has suffered and the present and

increased imminent risk of future harm, Plaintiff has lost time reviewing his bank statements daily and reviewing his credit report monthly.

179.    As a result of the Data Breach, Plaintiff McMullen was assessed a $35 overdraft fee for automatic billings on a compromised account he was forced to close.

180.    In addition to the increased risk and the actual harm suffered, the Data Breach has caused Plaintiff McMullen to spend significant time dealing with issues related to the Data Breach, which includes time spent verifying the legitimacy of the Data Breach Notice Letter, and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. This time, which has been lost forever and cannot be recaptured, was spent at Defendant's direction.

181.    The present and substantial risk of imminent harm and loss of privacy have both caused Plaintiff McMullen to suffer stress, fear, and anxiety.

182.    Plaintiff McMullen has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

### Plaintiff Washington's Experience

183.    Plaintiff Washington values her privacy and makes every effort to keep her personal information private.

184.    Plaintiff Washington only allowed Defendant to maintain, store, and use her Private Information because she believed that Defendant would use basic security measures to protect her Private Information, such as requiring passwords and multi-factor authentication to access databases storing her Private Information.

185.    As soon as Plaintiff Washington's Private Information was accessed and obtained by a third party without her consent or authorization, she suffered injury from a loss of privacy.

186.    Plaintiff Washington has been further injured by the damages to and diminution in value of her Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff was deprived of when her Private Information was placed on a publicly accessible database, exfiltrated by cybercriminals.

187.    Furthermore, Plaintiff Washington has experienced increased spam calls, text messages, and emails related to medical equipment her doctor supposedly prescribed (approximately 5-6 per day). After the Data Breach, Plaintiff received bills for medical appointments she did not attend, and she received notification from a credit monitoring service that her confidential information was posted on the dark web.

188.    Additionally, since the Data Breach, Plaintiff has noticed an unexplained decline in her credit score. Plaintiff has reviewed her credit reports and has not identified any new accounts, late payments, or other activity that would account for the reduction. On information and belief, the drop in Plaintiff's credit score is attributable to the compromise of her Private Information in the Data Breach, which exposes her to fraudulent inquiries or other adverse credit events that may not yet appear on her reports. As a result, Plaintiff has suffered harm in the form of a diminished credit score, increased risk of identity theft, and the ongoing need to spend time and resources monitoring her credit and financial accounts.

189.    The Data Breach has also caused Plaintiff Washington to suffer imminent and impending injury arising from the present and substantially increased risk of future fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of criminals.

190.    In addition to the increased risk and the actual harm suffered, the Data Breach has caused Plaintiff Washington to spend significant time dealing with issues related to the Data Breach, which includes time spent verifying the legitimacy of the Data Breach Notice Letter, and

self-monitoring her accounts and credit reports to ensure no fraudulent activity has occurred. This time, which has been lost forever and cannot be recaptured, was spent at Defendant's direction.

191. The present and substantial risk of imminent harm and loss of privacy have both caused Plaintiff Washington to suffer stress, fear, and anxiety.

192. Plaintiff Washington has a continuing interest in ensuring that Plaintiff's Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

### *Plaintiff Florcyzkowsi's Experience*

193. Plaintiff Florcyzkowsi values his privacy and makes every effort to keep his personal information private.

194. Plaintiff Florcyzkowsi only allowed Defendant to maintain, store, and use his Private Information because he believed that Defendant would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information.

195. In the instant that Plaintiff Florcyzkowsi's Private Information was accessed and obtained by a third party without his consent or authorization, Plaintiff suffered injury from a loss of privacy.

196. Plaintiff Florcyzkowsi has been further injured by the damages to and diminution in value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff was deprived of when his Private Information was placed on a publicly accessible database, exfiltrated by cybercriminals.

197. Plaintiff Florcyzkowsi's Private Information has already been stolen and misused as he has experienced incidents of fraud and identity theft so far in the form of having his

information shared on the dark web. These actions by unauthorized criminal third parties have detrimentally impacted Plaintiff's life as a whole and specifically caused financial strain on him as a direct result of the Data Breach.

198.    Furthermore, Plaintiff Florcyzkowsi has experienced increased spam calls and spam text messages as a result of the Data Breach.

199.    The Data Breach has also caused Plaintiff Florcyzkowsi to suffer imminent and impending injury arising from the present and substantially increased risk of future fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

200.    As a result of the actual harm Plaintiff Florcyzkowsi has suffered and the present and increased imminent risk of future harm, Plaintiff has lost time researching and investigating the breach and checking his credit and bank statements.

201.    In addition to the increased risk and the actual harm suffered, the Data Breach has caused Plaintiff Florcyzkowsi to spend significant time dealing with issues related to the Data Breach, which includes time spent continuously monitoring his financial accounts for continued fraudulent activity. This time, which has been lost forever and cannot be recaptured, was spent at Defendant's direction.

202.    The present and substantial risk of imminent harm and loss of privacy have both caused Plaintiff Florcyzkowsi to suffer fear and anxiety stemming from constant worry of fraud.

203.    Plaintiff Florcyzkowsi has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

***Plaintiff Contee's Experience***

204.    Plaintiff Contee values his privacy and makes every effort to keep his personal

information private.

205.    Plaintiff Contee only allowed Defendant to maintain, store, and use his Private Information because he believed that Defendant would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information.

206.    In the instant that Plaintiff Contee's Private Information was accessed and obtained by a third party without his consent or authorization, Plaintiff suffered injury from a loss of privacy.

207.    Plaintiff Contee has been further injured by the damages to and diminution in value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff was deprived of when his Private Information was placed on a publicly accessible database, exfiltrated by cybercriminals.

208.    Plaintiff Contee's Private Information has already been stolen and misused as he has experienced incidents of fraud and identity theft so far in the form of having his information shared on the dark web. These actions by unauthorized criminal third parties have detrimentally impacted Plaintiff's life as a whole and specifically caused financial strain on him as a direct result of the Data Breach.

209.    Furthermore, Plaintiff Contee has experienced increased spam calls, spam text messages, and received notifications that his confidential information has been shared on the dark web, as a result of the Data Breach.

210.    The Data Breach has also caused Plaintiff Contee to suffer imminent and impending injury arising from the present and substantially increased risk of future fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

211.    As a result of the actual harm Plaintiff Contee has suffered and the present and

increased imminent risk of future harm, Plaintiff has lost time reviewing account statements closely, logging into online accounts to monitor activity, obtaining credit reports, and researching news coverage about the breach.

212.    In addition to the increased risk and the actual harm suffered, the Data Breach has caused Plaintiff Contee to spend significant time dealing with issues related to the Data Breach, which includes time spent continuously monitoring his financial accounts for continued fraudulent activity. This time, which has been lost forever and cannot be recaptured, was spent at Defendant's direction.

213.    The present and substantial risk of imminent harm and loss of privacy have both caused Plaintiff Contee to suffer stress and anxiety stemming from constant worry of fraud. Plaintiff fears that his information is out on the dark web and that people may use it to open accounts in his name, commit fraud, and impersonate him.

214.    Plaintiff Contee has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

### *Plaintiff Eils' Experience*

215.    Plaintiff Eils values his privacy and makes every effort to keep his personal information private.

216.    Plaintiff Eils only allowed Defendant to maintain, store, and use his Private Information because he believed that Defendant would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information.

217.    In the instant that Plaintiff Eils' Private Information was accessed and obtained by

a third party without his consent or authorization, Plaintiff suffered injury from a loss of privacy.

218.    Plaintiff Eils has been further injured by the damages to and diminution in value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff was deprived of when his Private Information was placed on a publicly accessible database, exfiltrated by cybercriminals.

219.    Plaintiff Eils' Private Information has already been stolen and misused as he has experienced incidents of fraud and identity theft so far in the form of having his information shared on the dark web. These actions by unauthorized criminal third parties have detrimentally impacted Plaintiff's life as a whole.

220.    Furthermore, Plaintiff Eils has experienced unauthorized individuals attempting to take money out of his bank account, unauthorized credit card charges, increased spam calls, and increased spam text messages as a result of the Data Breach.

221.    The Data Breach has also caused Plaintiff Eils to suffer imminent and impending injury arising from the present and substantially increased risk of future fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

222.    As a result of the actual harm Plaintiff Eils has suffered and the present and increased imminent risk of future harm, Plaintiff has lost time daily reviewing account statements closely, logging into online accounts to check activity, notifying banks, calling Defendant, researching news coverage about the breach, and changing account management methods.

223.    In addition to the increased risk and the actual harm suffered, the Data Breach has caused Plaintiff Eils to spend significant time dealing with issues related to the Data Breach, which includes time spent monitoring his financial accounts for continued fraudulent activity. This time, which has been lost forever and cannot be recaptured, was spent at Defendant's direction.

224.    The present and substantial risk of imminent harm and loss of privacy have both caused Plaintiff Eils to suffer stress and anxiety stemming from constant worry of fraud. Plaintiff fears that his information is available on the dark web and worries there will be potential fraud across his four different bank accounts.

225.    Plaintiff Eils has a continuing interest in ensuring that Plaintiff's Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

**Plaintiff San Nicholas' Experience**

226.    Plaintiff San Nicolas values his privacy and makes every effort to keep his personal information private.

227.    Plaintiff San Nicolas only allowed Defendant to maintain, store, and use his Private Information because he believed that Defendant would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information.

228.    In the instant that Plaintiff San Nicolas's Private Information was accessed and obtained by a third party without his consent or authorization, Plaintiff suffered injury from a loss of privacy.

229.    Plaintiff San Nicolas has been further injured by the damages to and diminution in value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff was deprived of when his Private Information was placed on a publicly accessible database, exfiltrated by cybercriminals.

230.    Plaintiff San Nicolas' Private Information has already been stolen and misused as he has experienced incidents of fraud and identity theft so far in the form of having his information

shared on the dark web. These actions by unauthorized criminal third parties have detrimentally impacted Plaintiff's life as a whole and specifically caused financial strain on him as a direct result of the Data Breach.

231. Furthermore, Plaintiff San Nicolas has experienced increased spam calls, spam text messages, and received notifications that his confidential information has been shared on the dark web, as a result of the Data Breach.

232. The Data Breach has also caused Plaintiff San Nicolas to suffer imminent and impending injury arising from the present and substantially increased risk of future fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

233. As a result of the actual harm Plaintiff San Nicolas has suffered and the present and increased imminent risk of future harm, Plaintiff has lost time reviewing account statements closely, logging into online accounts to monitor activity, obtaining credit reports, and researching news coverage about the breach.

234. In addition to the increased risk and the actual harm suffered, the Data Breach has caused Plaintiff San Nicolas to spend significant time dealing with issues related to the Data Breach, which includes time spent continuously monitoring his financial accounts for continued fraudulent activity. This time, which has been lost forever and cannot be recaptured, was spent at Defendant's direction.

235. The present and substantial risk of imminent harm and loss of privacy have both caused Plaintiff San Nicolas to suffer stress and anxiety stemming from constant worry of fraud. Plaintiff fears that his information is out on the dark web and that people may use it to open accounts in his name, commit fraud, and impersonate him.

236. Plaintiff San Nicolas has a continuing interest in ensuring that his Private

Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

### *Plaintiff Dowell's Experience*

237.    Plaintiff Dowell values his privacy and makes every effort to keep his personal information private.

238.    Plaintiff Dowell only allowed Defendant to maintain, store, and use his Private Information because he believed that Defendant would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information.

239.    In the instant that Plaintiff Dowell's Private Information was accessed and obtained by a third party without his consent or authorization, Plaintiff suffered injury from a loss of privacy.

240.    Plaintiff Dowell has been further injured by the damages to and diminution in value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff was deprived of when his Private Information was placed on a publicly accessible database, exfiltrated by cybercriminals.

241.    Plaintiff Dowell's Private Information has already been stolen and misused as he has experienced incidents of fraud and identity theft so far in the form of having his information shared on the dark web. Plaintiff received notice of an induvial attempting to take a loan out in his name. Additionally, Plaintiff has received charges on his accounts that he did not authorize.

242.    Furthermore, Plaintiff Dowell has experienced increased spam calls, spam text messages, and has received notifications that his confidential information was shared on the dark web as a result of the Data Breach.

243.    The Data Breach has also caused Plaintiff Dowell to suffer imminent and

impending injury arising from the present and substantially increased risk of future fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

244.    As a result of the actual harm Plaintiff Dowell has suffered and the present and increased imminent risk of future harm, Plaintiff has time researching and investigating card fraud alerts, reading news about the Data Breach, and communicating with attorneys.

245.    In addition to the increased risk and the actual harm suffered, the Data Breach has caused Plaintiff Dowell to spend significant time dealing with issues related to the Data Breach, which includes time spent continuously monitoring his financial accounts for continued fraudulent activity. This time, which has been lost forever and cannot be recaptured, was spent at Defendant's direction.

246.    The present and substantial risk of imminent harm and loss of privacy have both caused Plaintiff Dowell to suffer stress and fear.

247.    Plaintiff Dowell has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

***Plaintiff Burrows's Experience***

248.    Plaintiff Burrows values his privacy and makes every effort to keep his personal information private.

249.    Plaintiff Burrows only allowed Defendant to maintain, store, and use his Private Information because he believed that Defendant would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information.

250.    In the instant that Plaintiff Burrows's Private Information was accessed and

obtained by a third party without his consent or authorization, Plaintiff suffered injury from a loss of privacy.

251. Plaintiff Burrows has been further injured by the damages to and diminution in value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff was deprived of when his Private Information was placed on a publicly accessible database, exfiltrated by cybercriminals.

252. Plaintiff Burrows's Private Information has already been stolen and misused as he has experienced incidents of fraud and identity theft so far in the form of having his information shared on the dark web. These actions by unauthorized criminal third parties have detrimentally impacted Plaintiff Burrows's life as a whole and specifically caused financial strain on him as a direct result of the Data Breach.

253. Furthermore, Plaintiff Burrows has experienced increased spam calls and spam text messages as a result of the Data Breach.

254. Shortly after the Data Breach, Plaintiff Burrows received an alert from his bank card, notifying him of a potential fraud attempt.

255. Shortly after the Data Breach, Plaintiff Burrows received a notification from Capital One and Experian informing him that his Private Information was found on the dark web.

256. The Data Breach has also caused Plaintiff Burrows to suffer imminent and impending injury arising from the present and substantially increased risk of future fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

257. As a result of the actual harm Plaintiff Burrows has suffered and the present and increased imminent risk of future harm, Plaintiff Burrows has lost time researching and investigating the breach and checking his credit and bank statements.

41

258. In addition to the increased risk and the actual harm suffered, the Data Breach has caused Plaintiff Burrows to spend significant time dealing with issues related to the Data Breach, which includes time spent continuously monitoring his financial accounts for continued fraudulent activity. This time, which has been lost forever and cannot be recaptured, was spent at Defendant's direction.

259. The present and substantial risk of imminent harm and loss of privacy have both caused Plaintiff Burrows to suffer fear and anxiety stemming from constant worry of fraud.

260. Plaintiff Burrows has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches

### *Plaintiff Christopherson's Experience*

261. Plaintiff Christopherson values his privacy and makes every effort to keep his personal information private.

262. Plaintiff Christopherson only allowed Defendant to maintain, store, and use his Private Information because he believed that Defendant would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information.

263. In the instant that Plaintiff Christopherson's Private Information was accessed and obtained by a third party without his consent or authorization, Plaintiff suffered injury from a loss of privacy.

264. Plaintiff Christopherson has been further injured by the damages to and diminution in value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff was deprived of when his Private

Information was placed on a publicly accessible database, exfiltrated by cybercriminals.

265.    Plaintiff Christopherson's Private Information has already been stolen and misused as he has experienced incidents of fraud and identity theft so far in the form of having his information shared on the dark web. These actions by unauthorized criminal third parties have detrimentally impacted Plaintiff Christopherson's life as a whole and specifically caused financial strain on him as a direct result of the Data Breach.

266.    Furthermore, Plaintiff Christopherson has experienced increased spam calls and spam text messages as a result of the Data Breach. Plaintiff Christopherson began receiving up to 50 spam calls a day. As a result, Plaintiff Christopherson had to change his phone number.

267.    Shortly after the Data Breach, Plaintiff Christopherson began seeing fraudulent charges on his bank card. Plaintiff Christopherson used this same bank card to pay for his home appraisal with Defendant. Plaintiff Christopherson did not experience issues with this card before the Data Breach.

268.    The Data Breach has also caused Plaintiff Christopherson to suffer imminent and impending injury arising from the present and substantially increased risk of future fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

269.    As a result of the actual harm Plaintiff Christopherson has suffered and the present and increased imminent risk of future harm, Plaintiff Christopherson has lost time researching and investigating the breach and checking his credit and bank statements.

270.    In addition to the increased risk and the actual harm suffered, the Data Breach has caused Plaintiff Christopherson to spend significant time dealing with issues related to the Data Breach, which includes time spent continuously monitoring his financial accounts for continued fraudulent activity. This time, which has been lost forever and cannot be recaptured, was spent at

Defendant's direction.

271.    The present and substantial risk of imminent harm and loss of privacy have both caused Plaintiff Christopherson to suffer fear and anxiety stemming from constant worry of fraud.

272.    Plaintiff Christopherson has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches

### Plaintiff Whigham's Experience

273.    Plaintiff Whigham values her privacy and makes every effort to keep her personal information private.

274.    Plaintiff Whigham only allowed Defendant to maintain, store, and use her Private Information because she believed that Defendant would use basic security measures to protect her Private Information, such as requiring passwords and multi-factor authentication to access databases storing her Private Information.

275.    In the instant that Plaintiff Whigham's Private Information was accessed and obtained by a third party without her consent or authorization, Plaintiff suffered injury from a loss of privacy.

276.    Plaintiff Whigham has been further injured by the damages to and diminution in value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff Whigham was deprived of when her Private Information was placed on a publicly accessible database, exfiltrated by cybercriminals.

277.    Plaintiff Whigham's Private Information has already been stolen and misused as she has experienced incidents of fraud and identity theft so far in the form of having her information shared on the dark web. These actions by unauthorized criminal third parties have

detrimentally impacted Plaintiff Whigham's life as a whole and specifically caused financial strain on him as a direct result of the Data Breach.

278.    Furthermore, Plaintiff Whigham has experienced increased spam calls and spam text messages as a result of the Data Breach.

279.    Shortly after the Data Breach, Plaintiff Whigham began receiving fraud alerts informing her that an individual was trying to take money out of her bank account. Each time, Plaintiff Whigham has to respond to the alerts and inform her bank that the transactions are fraudulent.

280.    The Data Breach has also caused Plaintiff Whigham to suffer imminent and impending injury arising from the present and substantially increased risk of future fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

281.    As a result of the actual harm Plaintiff Whigham has suffered and the present and increased imminent risk of future harm, Plaintiff Whigham has lost time researching and investigating the breach and checking his credit and bank statements.

282.    In addition to the increased risk and the actual harm suffered, the Data Breach has caused Plaintiff Whigham to spend significant time dealing with issues related to the Data Breach, which includes time spent continuously monitoring his financial accounts for continued fraudulent activity. This time, which has been lost forever and cannot be recaptured, was spent at Defendant's direction.

283.    The present and substantial risk of imminent harm and loss of privacy have both caused Plaintiff Whigham to suffer fear and anxiety stemming from constant worry of fraud.

284.    Plaintiff Whigham has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is

protected, and safeguarded from future breaches.

### F. Plaintiffs and the Class Suffered Common Injuries and Damages Due to Defendant's Conduct

285.    Defendant's failure to implement or maintain adequate data security measures for Plaintiffs' and Class Members' Private Information directly and proximately injured Plaintiffs and Class Members by the resulting disclosure of their Private Information in the Data Breach.

286.    Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice, "[a] direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss."[32]

287.    Individuals, like Plaintiffs and Class members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and is likened to accessing your DNA for hacker's purposes.

288.    Data Breach victims suffer long-term consequences when their Social Security numbers are taken and used by hackers.

289.    The Social Security Administration ("SSA") has warned that, "You should know that other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) have records under your old number.

---

[32] Erika Harrell, *Victims of Identity Theft, 2018*, 9, U.S. Dep't of Justice Bureau of Justice Statistics (Apr. 2021), https://bjs.ojp.gov/content/pub/pdf/vit18.pdf  (last visited Nov. 3, 2025).

Along with other personal information, credit reporting companies use the number to identify your credit record. So, using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same."[33]

290.    Because of Defendant's failure to prevent the Data Breach, Plaintiffs and Class members suffered—and will continue to suffer—damages. These damages include, inter alia, monetary losses, lost time, anxiety, fear, and emotional distress. Also, they suffered or are at an increased risk of suffering:

      a.   identity theft and fraud;

      b.   loss of time to mitigate the risk of identity theft and fraud

      c.   diminution in value of their Private Information;

      d.   out-of-pocket costs from trying to prevent, detect, and recover from identity theft and fraud;

      e.   lost benefit of the bargain and opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, inter alia, preventing, detecting, contesting, and recovering from identify theft and fraud;

      f.   delay in receipt of tax refund monies;

      g.   loss of the opportunity to control how their Private Information is used;

      h.   compromise and continuing publication of their Private Information;

      i.   unauthorized use of their stolen Private Information;

      j.   invasion of privacy; and

      k.   continued risk to their Private Information —which remains in Defendant's possession—and is thus as risk for futures breaches so long as Defendant fails to take appropriate measures to protect the Private Information.

291.    Many Class Members suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

---

[33] *Identity Theft and Your Social Security Number*, SSA (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Nov. 3, 2025).

a.   Finding fraudulent charges;

b.   Cancelling and reissuing credit and debit cards;

c.   Purchasing credit monitoring and identity theft prevention;

d.   Monitoring their medical records for fraudulent charges and data;

e.   Addressing their inability to withdraw funds linked to compromised accounts;

f.   Taking trips to banks and waiting in line to obtain funds held in limited accounts;

g.   Placing "freezes" and "alerts" with credit reporting agencies;

h.   Spending time on the phone with or at a financial institution to dispute fraudulent charges;

i.   Contacting financial institutions and closing or modifying financial accounts;

j.   Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

k.   Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

l.   Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

292.    Moreover, Plaintiffs and Class Members have an interest in ensuring that their PII, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information is not accessible online and that access to such data is password protected.

293.    The ramifications of Defendant's failure to keep consumers' PII secure are long lasting and severe. Once PII is stolen, particularly Social Security and driver's license numbers, fraudulent use of that information and damage to victims including Plaintiffs and the Class may continue for years.

### G.  Significant Risk of Continued Identity Theft

294.    Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

295.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

296.    The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

297.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the dark web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

298.    The dark web is an unindexed layer of the internet that requires special software or authentication to access.[34] Criminals in particular favour the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[35] This prevents dark web

---

[34] Louis DeNicola, *What Is the Dark Web?*, Experian (May 12, 2021), https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited Nov. 3, 2025).

[35] *Id.*

marketplaces from being easily monitored by authorities or accessed by those not in the know.

299.   The unencrypted Private Information of Plaintiffs and Class Members has or will end up for sale on the dark web because that is the modus operandi of hackers. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Plaintiffs' and Class Members' Private Information.

300.   The value of Plaintiffs' and Class's Private Information on the black market is considerable. Stolen Private Information trades on the black market for years and is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen Private Information can be worth up to $1,000.00 depending on the type of information obtained. criminals frequently post and sell stolen information openly and directly on the "dark web"—further exposing the information.

301.   Criminals can also purchase access to entire company's data breaches from $900 to $4,500.[36]

302.   It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the Private Information far and wide.

303.   Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

304.   For example, armed with just a name and date of birth, a data thief can utilize a

---

[36] *In the Dark*, VPNOverview (2019), https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Nov. 3, 2025).

hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

305.    Identity thieves can also use an individual's personal data and Private Information to obtain credit in the victim's name, file a fraudulent tax return using the victim's information, oe even obtain a job using the victim's identity.[37]

306.    One example of criminals piecing together bits and pieces of compromised Private Information to create comprehensive dossiers on individuals is called "Fullz" packages.[38] These dossiers are both shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference sources of Private Information to marry unregulated data available elsewhere to criminally-stolen data with an astonishingly complete scope and degree of accuracy to assemble dossiers on individuals. For example, they can combine the stolen Private Information, and with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

---

[37] *Identity Theft and Your Social Security Number,* 1, 6, https://www.ssa.gov/pubs/EN-05-10064.pdf, *supra*, n.33.

[38] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited Nov. 3, 2025).

307.     The development of "Fullz" packages means that the Private Information exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

308.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> Scammers use your Social Security number (SSN) to get other personal information about you. They can use your SSN and your good credit to apply for more credit in your name. Then, when they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your SSN until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought.[39]

309.     Attempting to change or cancel a stolen Social Security number is difficult if not nearly impossible. An individual cannot obtain a new Social Security number without evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing

---

[39] *Identity Theft and Your Social Security Number,* 1, https://www.ssa.gov/pubs/EN-05-10064.pdf, *supra*, n.33.

fraud activity to obtain a new number.

310.   Even a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[40]

311.   This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[41]

312.   Private Information can be used to distinguish, identify, or trace an individual's identity, such as their name and Social Security number.  This can be accomplished alone, or in combination with other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.[42]

313.   Given the nature of this Data Breach, it is foreseeable that the compromised PII can be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Plaintiffs' or Class Members' PII can easily obtain Plaintiffs' or Class Members' tax returns or open fraudulent credit card accounts in Plaintiffs' or Class Members' names.

314.   The Private Information compromised in this Data Breach is static and difficult, if

---

[40] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Nov. 3 , 2025).

[41] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, NetworkWorld (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Nov. 3, 2025).

[42]  *See* Clay Johnson III, *Safeguarding Against and Responding to the Breach of Personally Identifiable Information*, Office of Mgmt. & Budget (May 22, 2007), OMB Memorandum M-07-16, 1 at n.1, https://georgewbush-whitehouse.archives.gov/omb/memoranda/fy2007/m07-16.pdf (last visited Nov. 3, 2025).

not impossible, to change (such as Social Security numbers).

315.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[43]

316.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[44] Yet, Defendant failed to rapidly report to Plaintiffs and the Class that their Private Information was stolen. Defendant's failure to promptly and properly notify Plaintiffs and Class members of the Data Breach exacerbated Plaintiffs and Class members' injury by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take necessary steps to mitigate the harm caused by the Data Breach.

317.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

318.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

319.    Further complicating the issues faced by victims of identity theft, data thieves may

---

[43] *2019 Internet Crime Report Released*, FBI (Feb. 11, 2020), https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited Nov. 3, 2025).

[44] *Id.*

wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

### H.  Loss of Time to Mitigate the Risk of Identify Theft and Fraud

320.    As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

321.    In the event that Plaintiffs and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record.

322.    Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate that harm.

323.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

324.    These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud

alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[45]

325.   Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendant's conduct that caused the Data Breach.

## I.   Diminished Value of Private Information

326.   Personal data like Private Information is a valuable property right.[46]

327.   Cybercriminals intentionally attack and exfiltrate Private Information to exploit it. Thus, Class Members are now, and for the rest of their lives will be, at a heightened and substantial risk of identity theft.  Plaintiffs have also incurred (and will continue to incur) damages in the form of, inter alia, loss of privacy and costs of engaging adequate credit monitoring and identity theft protection services.

328.   The cybercriminals who obtained the Class Members' Private Information may exploit the information they obtained by selling the data in so-called "dark markets" or on the "dark web."  Having obtained these names, addresses, Social Security numbers, and other PII, cybercriminals can pair the data with other available information to commit a broad range of fraud in a Class Member's name, including but not limited to:

---

[45] *See*  FTC, *What To Do Right Away: What To Do Next*, IdentityTheft.gov, https://www.identitytheft.gov/Steps (last visited Sept. 8, 2025).

[46] *See, e.g.,* John T. Soma, *et al.*, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII/PHI") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII/PHI, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

    a.   obtaining employment;

    b.   obtaining a loan;

    c.   applying for credit cards or spending money;

    d.   filing false tax returns;

    e.   stealing Social Security and other government benefits; and

    f.   applying for a driver's license, birth certificate, or other public document.

329.    In addition, if a Class Member's Social Security number is used to create false identification for someone who commits a crime, the Class Member may become entangled in the criminal justice system, impairing the person's ability to gain employment or obtain a loan.

330.    As a direct and/or proximate result of Defendant's wrongful actions and/or inaction and the resulting Data Breach, Plaintiffs and the other Class Members have been deprived of the value of their PII, for which there is a well-established national and international market.

331.    PII's value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

332.    An active and robust legitimate marketplace for personal information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[47]

333.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[48] Consumers who agree to provide their web browsing

---

[47] David Lazarus, *Shadowy data brokers make the most of their invisibility cloak*, L.A. Times (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Nov. 3, 2025).

[48] Datacoup, Inc., *The personal data revolution*, https://datacoup.com (last visited Oct. 28, 2025).

history to the Nielsen Corporation can receive up to $60 a year.[49]

334. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and black markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where it holds significant value for the threat actors.

335. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

**J.    Future Cost of Credit and Identify Theft Monitoring is Reasonable and Necessary**

336. To date, Defendant has done little to provide Plaintiffs and Class Members with relief for the damages they have suffered due to the Data Breach.

337. Given the type of targeted attack in this case and sophisticated criminal activity, the type of information involved, and the modus operandi of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes— e.g., opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or insurance; or filing false unemployment claims.

338. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that her or her information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected

---

[49] Nielsen Computer & Mobile Panel, *Frequently Asked Questions*, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Nov. 3, 2025).

fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

339.     Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel their cards and request a replacement.[50]

340.     The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

341.     Consequently, Plaintiffs and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

342.     The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

343.     Furthermore, Private Information has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for fraudulent misuse of this information to be detected.

344.     Accordingly, Defendant's wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiffs and the other Class Members at an imminent, immediate, and continuing increased risk of identity theft and identity fraud.  Indeed, "[t]he level of risk is growing for anyone whose information is stolen in a data breach."  Javelin Strategy & Research,

---

[50] Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, Forbes (Mar 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last visited Nov. 3, 2025).

a leading provider of quantitative and qualitative research, notes that "[t]he theft of SSNs places consumers at a substantial risk of fraud."   Moreover, there is a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported.  Even data that have not yet been exploited by cybercriminals bears a high risk that the cybercriminals who now possess Class Members' PII will do so at a later date or re-sell it.

345.    As a result of the Data Breach, Plaintiffs and Class Members have already suffered injuries, and each are at risk of a substantial and imminent risk of future identity theft.

**K. Lost Benefit of the Bargain**

346.    Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain.

347.    When agreeing to provide their Private Information, which was a condition precedent to obtain or apply for services or employment from Defendant, Plaintiffs and Class Members understood and expected that they were, in part, paying for services or receiving lesser wages, in exchange for data security to protect the Private Information they were required to provide.

348.    Plaintiffs value data security. Indeed, data security is an important consideration of seeking financial services.

349.    In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[51] Therein, Cisco reported the following:

> "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they

---

[51] Cisco, *Privacy Awareness: Consumers Taking Charge to Protect Personal,* https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited Nov. 3, 2025).

won't purchase from an organization they don't trust with their data."[52]

350.    "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[53] 89% of consumers stated that "I care about data privacy."[54] 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[55]

351.    Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services of a lesser value than what they reasonably expected to receive under the bargains struck with Defendant.

## L.  Defendant Could Have Prevented the Data Breach

352.    Data breaches are preventable.[56] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[57] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[58]

353.    "Most of the reported data breaches are a result of lax security and the failure to

---

[52] *Id*. at 3.

[53] *Id*.

[54] *Id*. at 9.

[55] *Id*.

[56] Lucy L. Thomson, *Despite the Alarming Trends, Cybersecurity Incidents Are Preventable*, in *Cybersecurity Incident and Encryption Handbook* (Lucy Thompson, ed., 2012).

[57] *Id.* at 17.

[58] *Id.* at 28.

create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [59]

354.    In a Data Breach like the one here, many failures laid the groundwork for the Breach. For example, the FTC has published guidelines that establish reasonable data security practices for businesses. The guidelines also emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.

355.    Additionally, several industry-standard best practices have been identified that—at a minimum—should be implemented by businesses like Defendant.

**M. Defendant Failed to Adhere to FTC Guidelines**

356.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of Private Information.

357.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business.  The guidelines explain that businesses should: (i) protect the personal information that they keep; (ii) properly dispose of personal information that is no longer needed; (iii) encrypt information stored on computer networks; (iv) understand their network's vulnerabilities; and (v) implement policies to correct security problems.

---

[59] *Id.*

358.     The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

359.     The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

360.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect individuals data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

361.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs and Class Members Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

**N.  Defendant Failed to Adhere to GLBA Standards**

362.     Experts studying cybersecurity routinely identify financial services providers as being particularly vulnerable to cyberattacks and security breaches because of the value of the Private Information which they collect and maintain.

363.     The Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6801, *et seq.*, defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C.

§ 6809(3)(A). Defendant qualifies as a financial institution under this definition and is subject to the GLBA.

364.    Defendant collects nonpublic PII, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant period Defendant was subject to the requirements of the GLBA, 15 U.S.C. § 6801.1, et seq., and is subject to numerous rules and regulations promulgated under the GLBA.

365.    Defendant's conduct is governed by Regulation P, 12 C.F.R. § 1016 ("Regulation P"), the rule that established the Privacy of Consumer Financial Information.

366.    Defendant recognizes that it is subject to the GLBA and Regulation P.[60]

367.    Defendant was thus aware at all times of its obligation to protect the Private Information of consumers.  Defendant was also aware of the significant repercussions that would result from their failure to do so.

368.    Defendant's inadequate data security measures violated applicable rules, regulations, and standards regarding data security. By not taking adequate security measures. Defendant violated the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6801, *et seq*., and the industry best practices that the GLBA requires for financial institutions.

369.    The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including:

---

[60] *Policy Compliance Manual*, at 30, Union Home Mortgage (Oct. 22, 2025), https://www.uhmgo. com/contentimages/706405964/UHM_Compliance_Policy_Manual.pdf  (last  visited  Nov.  3, 2025).

    a.   designating one or more employees to coordinate the information security program;

    b.   identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks;

    c.   designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures;

    d.   overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and

    e.   evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4.

370.   Defendant was subject to the Safeguard Rule and violated the Safeguard Rule.

371.   Defendant failed to assess reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information.

372.   Defendants' conduct resulted in myriad failures to follow GLBA-mandated rules and regulations, many of which are also industry standard.

**O.  Defendant Failed to Follow Industry Standards**

373.   Experts studying cybersecurity routinely identify financial corporations as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

374.     Several best practices have been identified that—at a minimum—should be implemented by businesses like Defendant. These industry standards include: educating all employees regarding cybersecurity; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

375.     Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

376.     Moreover, companies should retain personal data only as necessary, with legal justification. Personal data should not be stored beyond the time necessary to achieve its initial purpose of collection. In line with industry standard practices, Defendant should have promptly deleted any data it no longer needed to provide services to Plaintiffs and the Class.

377.     Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

378.    These frameworks are applicable and accepted industry standards by which Defendant should have complied. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## P.  The Harm Caused by the Data Breach Now and Going Forward

379.    Victims of data breaches are susceptible to becoming victims of identity theft. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201(9). When "identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[61]

380.    The type of data that may have been accessed and compromised here can be used to perpetrate fraud and identity theft.

381.    Plaintiffs and Class Members face a substantial risk of identity theft given that their Private Information was compromised in the Data Breach.

382.    Stolen Private Information is often trafficked on the "dark web," a heavily encrypted part of the Internet that is not accessible via traditional search engines. Law enforcement has difficulty policing the "dark web" due to this encryption, which allows users and criminals to conceal their identities and online activity.

383.    When malicious actors infiltrate companies and copy and exfiltrate the Private Information that those companies store, the stolen information often ends up on the dark web where malicious actors buy and sell that information for profit.[62]

---

[61] *Prevention and Preparedness*, New York State Police, https://troopers.ny.gov/prevention-and-preparedness (last visited Nov. 3, 2025).

[62]*Shining a Light on the Dark Web with Identity Monitoring*, IdentityForce (Dec. 28, 2020) https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last visited Nov. 3, 2025).

384.    For example, when the U.S. Department of Justice announced their seizure of AlphaBay—the largest online "dark market"—in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity."[63] Marketplaces similar to the now-defunct AlphaBay continue to be "awash with [PII] belonging to victims from countries all over the world."[64]

385.    As a result of the Data Breach, the Private Information of Plaintiffs and Class Members has been exposed to criminals for misuse. The injuries suffered by Plaintiffs and Class Members, or likely to be suffered as a direct result of Defendant's Data Breach, include: (a) theft of their Private Information; (b) costs associated with the detection and prevention of identity theft; (c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the consequences of this Breach; (d) invasion of privacy; (e) the emotional distress, fear, stress, nuisance, and annoyance of responding to, and resulting from, the Data Breach; (f) the actual and/or imminent injury arising from actual and/or potential fraud and identity theft resulting from their personal data being placed in the hands of the ill-intentioned hackers and/or criminals; (g) damage to and diminution in value of their personal data entrusted to Defendant with the mutual understanding that Defendant would safeguard their Private Information against theft and not allow access to and misuse of their personal data by any unauthorized third party; and (h) the continued risk to their Private Information, which remains in the possession of Defendant, and which is subject to further injurious breaches so long as Defendant fails to undertake appropriate and adequate measures to

---

[63] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor (April 3, 2018), https://res.armor. com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (last visited Nov. 3, 2025).

[64] *Id.*

protect Plaintiffs' and Class Members' Private Information.

386.    In addition to a remedy for economic harm, Plaintiffs and Class Members maintain an interest in ensuring that their Private Information is secure, remains secure, and is not subject to further misappropriation and theft.

387.    Defendant disregarded the rights of Plaintiffs and Class Members by (a) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that its network servers were protected against unauthorized intrusions; (b) failing to disclose that it did not have adequately robust security protocols and training practices in place to safeguard Plaintiffs' and Class Members' Private Information; (c) failing to take standard and reasonably available steps to prevent the Data Breach; (d) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (e) failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

388.    The actual and adverse effects to Plaintiffs and Class Members, including the imminent, immediate, and continuing increased risk of harm for identity theft, identity fraud and/or medical fraud directly or proximately caused by Defendant's wrongful actions and/or inaction and the resulting Data Breach require Plaintiffs and Class Members to take affirmative acts to recover their peace of mind and personal security including, without limitation, purchasing credit reporting services, purchasing credit monitoring and/or internet monitoring services, frequently obtaining, purchasing and reviewing credit reports, bank statements, and other similar information, instituting and/or removing credit freezes and/or closing or modifying financial accounts, for which there is a financial and temporal cost. Plaintiffs and other Class Members have suffered, and will continue to suffer, such damages for the foreseeable future.

## CLASS ALLEGATIONS

389.    Plaintiffs bring this class action on behalf of themselves and all other persons similarly situated in the proposed Nationwide Class (the "Nationwide Class" or "Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, and also on behalf of the proposed California Subclass.

390.    Plaintiffs propose the following Class definitions, subject to amendment as appropriate:

### The Class

All individuals within the United States whose Private Information was compromised by the Data Breach publicly announced by Defendant in August 2025 including all those who received a Notice (the "Class").

### California Subclass

All individuals residing in California whose Private Information was compromised by the Data Breach publicly announced by Defendant in August 2025 including all those who received a Notice (the "California Subclass").

### North Carolina Subclass

All individuals residing in North Carolina whose Private Information was compromised by the Data Breach publicly announced by Defendant in August 2025 including all those who received a Notice (the "North Carolina Subclass").

391.    Specifically excluded from the Class and Subclass are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, principals, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

392.    Plaintiffs reserve the right to amend the Class definitions above if further investigation and/or discovery reveals that the Classes should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

393.    This action may be certified as a class action because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

394.    <u>Numerosity</u>: The Class is so numerous that joinder of all Class Members is impracticable. Upon information and belief, the Class is comprised of thousands of members. The Class is sufficiently numerous to warrant certification.

395.    <u>Typicality of Claims</u>: Plaintiffs' claims are typical of those of other Class Members because Plaintiffs, like the unnamed Class, had their Private Information compromised as a result of the Data Breach. Plaintiffs are members of the Class, and their claims are typical of the claims of the members of the Class. The harm suffered by Plaintiffs is similar to that suffered by all other Class Members which was caused by the same misconduct by Defendant.

396.    <u>Adequacy of Representation</u>: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

397.    <u>Superiority</u>: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendant will likely continue its wrongful

conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

398.   <u>Predominance and Commonality</u>: The claims of all Class Members present common questions of law or fact, which predominate over any questions affecting only individual Class Members.  These common questions, which do not vary among Class Members and which may be determined without reference to any Class Member's individual circumstances, include, but are not limited to:

a. Whether Defendant failed to take adequate and reasonable measures to ensure its website and data systems were protected;

b. Whether Defendant failed to take available steps to prevent and stop the breach from happening or mitigating the risk of a long-term breach;

c. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

d. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

e. Whether Defendant's storage of Plaintiffs' and Class Member's Private Information was done in a negligent manner;

f. Whether Defendant had a duty to protect and safeguard Plaintiffs' and Class Members' Private Information;

g. Whether Defendant breached any duty to protect the personal information of Plaintiffs and Class Members by failing to exercise due care in protecting their PII;

h. Whether Defendant's conduct was negligent;

i. Whether Defendant unreasonably delayed in notifying Plaintiffs and Class members of the harm they suffered once the suspicious activity was detected;

j. Whether Defendant's conduct violated Plaintiffs' and Class Members' privacy;

k. Whether Defendant's conduct violated the statutes as set forth herein;

l. Whether Defendant took sufficient steps to secure Plaintiffs' and Class Members' Private Information;

m. Whether Defendant was unjustly enriched; and

n.  The nature of relief, including damages and equitable relief, to which Plaintiffs and Class Members are entitled.

399.    Information concerning Defendant's policies is available from Defendant's records.

400.    Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

401.    The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendant. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

402.    Given that Defendant had not indicated any changes to its conduct or security measures, monetary damages are insufficient and there is no complete and adequate remedy at law.

## CAUSES OF ACTION
### COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiffs and the Class)**

403.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

404.    Plaintiffs bring this claim individually and on behalf of the Class Members.

405.    Defendant knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

406.    Defendant had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs and Class Members' Private Information.

407. Defendant had, and continues to have, a duty to timely disclose that Plaintiffs' and Class Members' Private Information within its possession was compromised and precisely the types of information that were compromised.

408. Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards, applicable standards of care from statutory authority like Section 5 of the FTC Act, the GLBA, and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected individuals' Private Information.

409. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiffs and Class Members. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members from a data breach.

410. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

411. Defendant breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information.

412. Plaintiffs and Class Members entrusted their Private Information to Defendant with the understanding that Defendant would safeguard their Private Information.

413. Defendant had full knowledge of the sensitivity of the Private Information that it stored and the types of harm that Plaintiffs and Class Members could and would suffer if that Private Information were wrongfully disclosed.

414.    Plaintiffs and the Class had no ability to protect their Private Information that was in, and possibly remains in, Defendant's possession.

415.    Defendant was in a position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

416.    Defendant's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

417.    Defendant has admitted that the Private Information of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

418.    Defendant violated its duty to implement and maintain reasonable security procedures and practices. That duty includes, among other things, designing, maintaining, and testing Defendant's information security controls sufficiently rigorously to ensure that Private Information in its possession was adequately secured by, for example, encrypting sensitive personal information, installing effective intrusion detection systems and monitoring mechanisms, using access controls to limit access to sensitive data, regularly testing for security weaknesses and failures, failing to notify victims of the specific breached data in a timely manner, and failing to remedy the continuing harm by unreasonably delaying notifying specific victims who were harmed.

419.    Defendant's duty of care arose from, among other things,

a. The special relationship between Defendant, Plaintiffs, and Class Members resulting from Plaintiffs and Class Members entrusting Defendant with confidential Private Information;

b. Defendant's exclusive ability (and Class Members' inability) to ensure that its systems, website, and vendor services were sufficient to protect against the foreseeable risk that a data breach could occur;

c. Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, failing to adopt reasonable data security measures;

d. The GLBA, 15 U.S.C. § 6801, *et seq*., and the industry best practices that the GLBA requires for financial institutions; and

e. Defendant's common law duties to adopt reasonable data security measures to protect Private Information under its possession and to act under the same or similar circumstances as a reasonable and prudent person would act.

420. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to periodically ensure that its computer systems and networks had plans in place to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Class members' Private Information;

e. Failing to detect in a timely manner that Class members' Private Information had been compromised;

f.  Failing to remove former clients' Private Information it was no longer required to retain pursuant to regulations; and

g.  Failing to timely and adequately notify Class members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

421.  Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information within Defendant's possession.

422.  Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of Plaintiffs' and Class Members' Private Information.

423.  Defendant, through its actions and/or omissions, unlawfully breached its duty to timely disclose to Plaintiffs and Class Members that the Private Information within Defendant's possession might have been compromised and precisely the type of information compromised.

424.  Defendant breached the duties set forth in 15 U.S.C. § 45, the FTC guidelines, the GLBA, 15 U.S.C. § 6801, *et seq.* and the industry best practices that the GLBA requires for financial institutions, the National Institute of Standards and Technology's Framework for Improving Critical Infrastructure Cybersecurity, and other industry guidelines. In violation of 15 U.S.C. § 45, Defendant failed to implement proper data security procedures to adequately and reasonably protect Plaintiffs' and Class Members' Private Information. In violation of the FTC guidelines and GLBA guidelines, *inter alia,* Defendant did not protect the Private Information it keeps; failed to properly dispose of personal information that was no longer needed; failed to encrypt information stored on computer networks; lacked the requisite understanding of its networks' vulnerabilities; and failed to implement policies to correct security issues.

425. It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiffs' and Class Members' Private Information would result in injury to Plaintiffs and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

426. It was foreseeable that the failure to adequately safeguard Plaintiffs' and Class Members' Private Information would result in injuries to Plaintiffs and Class Members.

427. Defendant's breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information to be compromised.

428. But for Defendant's negligent conduct and breach of the above-described duties owed to Plaintiffs and Class Members, their Private Information would not have been compromised.

429. There is a temporal and close causal connection between Defendant's failure to implement adequate data security measures and notification practices, the Data Breach/unauthorized disclosure, and the harms suffered by Plaintiffs and Class Members.

430. As a result of Defendant's failure to timely notify Plaintiffs and Class Members that their Private Information had been compromised, Plaintiffs and Class Members are unable to take the necessary precautions to mitigate damages by preventing future fraud.

431. As a result of Defendant's negligence and breach of duties, Plaintiffs and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

432. Plaintiffs and Class Members have suffered, and will suffer damages including: monetary losses, lost time, anxiety, fear, and emotional distress, loss of privacy, a substantial increase in the likelihood of identity theft; the compromise, publication, and theft of their personal

information; loss of time and costs associated with the prevention, detection, and recovery from unauthorized use of their personal information; the continued risk to their personal information; future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the personal information compromised as a result of the Data Breach; overpayment for the services or products that were received without adequate data security; lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; experiencing an increase in spam calls, texts, and/or emails; nominal damages; and the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

433. Plaintiffs and Class Members are entitled to all forms of monetary compensation set forth herein, including monetary payments to provide adequate identity protection services. Plaintiffs and Class Members are also entitled to the injunctive relief sought herein.

434. Plaintiffs and Class Members also seek such other relief as the Court may deem just and proper.

## COUNT II
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiffs and the Class)

435. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

436. Plaintiffs bring this claim in the alternative to their claims arising in tort and equity.

437. Plaintiffs and the Class Members provided and entrusted their Private Information to Defendant. Plaintiffs and the Class Members provided their Private Information to Defendant

as part of Defendant's regular business practices.

438.    In so doing, Plaintiffs and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen, in return for the business services provided by Defendant. Implied in these exchanges was a promise by Defendant to ensure that the Private Information of Plaintiffs and Class Members in its possession was secure.

439.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations that were consistent with industry standards.

440.    Pursuant to these implied contracts, Plaintiffs and Class Members provided Defendant with their Private Information. In exchange, Defendant agreed to, among other things, and Plaintiffs and the Class understood that Defendant would: (1) provide services or employment to Plaintiffs and Class Members; (2) take reasonable measures to protect the security and confidentiality of Plaintiffs' and Class Members' Private Information; and (3) protect Plaintiffs' and Class Members' Private Information in compliance with federal and state laws and regulations and industry standards.

441.    Implied in these exchanges was a promise by Defendant to ensure the Private Information of Plaintiffs and Class Members in its possession was only used to provide the agreed-upon reasons, and that Defendant would take adequate measures to protect Plaintiffs and Class Members' Private Information.

442.    Defendant's implied promises are evidenced by the language in its public facing privacy policy.

443.   A material term of this contract is a covenant by Defendant that it would take reasonable efforts to safeguard that information. Defendant breached this covenant by allowing Plaintiffs and Class Members' Private Information to be accessed in the Data Breach.

444.   Indeed, implicit in the agreement between Defendant and Plaintiffs and Class Members was the obligation that both parties would maintain information confidentially and securely.

445.   These exchanges constituted an agreement and meeting of the minds between the parties.

446.   When the parties entered into an agreement, mutual assent occurred. Plaintiffs and Class Members would not have disclosed their Private Information to Defendant but for the prospect of utilizing Defendant services or employment with Defendant. Conversely, Defendant presumably would not have taken Plaintiffs and Class Members' Private Information if it did not intend to provide Plaintiffs and Class Members with its services or employment.

447.   Defendant was therefore required to reasonably safeguard and protect the Private Information of Plaintiffs and Class Members from unauthorized disclosure and use.

448.   Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their Private Information. The safeguarding of the Private Information of Plaintiffs and Class Members was critical to realize the intent of the parties.

449.   Plaintiffs and Class Members fully performed their obligations under the implied contracts with Defendant.

450.   Defendant breached the implied contracts with Plaintiffs and Class Members by failing to reasonably safeguard and protect Plaintiffs and Class Members' Private Information.

451.    Defendant's failure to implement adequate measures to protect the Private Information of Plaintiffs and Class Members violated the purpose of the agreement between the parties.

452.    Defendant breached its implied contracts with Plaintiffs and Class Members to protect their PII when it (1) failed to take reasonable steps to use safe and secure systems to protect that information; (2) failed to comply with industry standards; (3) failed to comply with the legal obligations necessarily incorporated into these agreements; and (4) failed to notify Plaintiffs and Class Members of the specific data breached in a reasonably timely manner.

453.    As a direct and proximate result of Defendant's breach of implied contract, Plaintiffs and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, medical identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of their PII; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Defendant's Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

454.     As a direct and proximate result of the breach/unauthorized disclosure, Plaintiffs and Class Members are entitled to relief as set forth herein.

455.     Plaintiffs also seek such other relief as the Court may deem just and proper.

**COUNT III**
**UNJUST ENRICHMENT**
**On Behalf of Plaintiffs and the Class**

456.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

457.     Plaintiffs bring this claim in the alternative to their claims arising in tort and contract.

458.     Plaintiffs and Class members conferred a benefit on Defendant. Specifically, they provided Defendant with their Private Information. In exchange, Defendant should have protected Plaintiffs and Class members' Private Information with adequate data security.

459.     Defendant knew that Plaintiffs and Class members conferred a benefit on it in the form of their Private Information. Defendant appreciated and accepted that benefit. Defendant profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

460.     Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments on behalf of or for the benefit of Plaintiffs and some Class Members.

461.     As such, a portion of the payments made for the benefit of or on behalf of Plaintiffs and Class members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

462.     Defendant, however, failed to secure Plaintiffs' and Class Members' Private

Information and, therefore, did not provide adequate data security in return for the benefit Plaintiffs and Class members provided.

463.    Defendant would not be able to carry out an essential function of its regular business without the Private Information of Plaintiffs and Class members and derived revenue by using it for business purposes. Plaintiffs and Class members expected that Defendant or anyone in Defendant's position would use a portion of that revenue to fund adequate data security practices.

464.    Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

465.    If Plaintiffs and Class members knew that Defendant had not reasonably secured their Private Information, they would not have allowed their Private Information to be provided to Defendant.

466.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Plaintiffs and Class members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiffs and Class members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

467.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money wrongfully obtained from Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are

mandated by industry standards.

468.    Plaintiffs and Class members have no adequate remedy at law.

469.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

470.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have suffered and will continue to suffer other forms of injury and/or harm.

471.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class members, proceeds that it unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class members overpaid for Defendant's services

472.    Accordingly, Plaintiffs and Class Members respectfully request that this Court award relief in the form of restitution or disgorgement in the amount of the benefit conferred on Defendant as a result of its wrongful conduct, including specifically, the amounts that Defendant

should have spent to provide reasonable and adequate data security to protect Plaintiffs and Class members' Private Information, and compensatory damages.

## COUNT IV
## VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT ("CCPA")
### Cal. Civ. Code § 1798.150
### (On behalf of Plaintiffs Peters and San Nicolas and the California Subclass)

473.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

474.    Defendant violated § 1798.150 of the CCPA by failing to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the nonencrypted Private Information of Plaintiffs Peters and San Nicolas. As a direct and proximate result, Plaintiffs Peters, San Nicolas, and the California Subclass's Private Information was subject to unauthorized access and exfiltration, theft, or disclosure.

475.    Defendant is a business organized for the profit and financial benefit of its owners according to § 1798.140, with annual gross revenues exceeding the threshold established by § 1798.140(d)(1)(A).

476.    Pursuant to Cal. Civ.  Code § 1798.150(b), Plaintiff Peters mailed a CCPA notice letter to Defendant's registered service agents on October 21, 2025, detailing the specific provisions of the CCPA that Defendant has and continues to violate.

477.    Plaintiffs Peters and San Nicolas seek injunctive or other equitable relief to ensure Defendant hereinafter adequately safeguards Private Information by implementing reasonable security procedures and practices. Such relief is particularly important because Defendant continues to hold Private Information, including Plaintiff Peters' and San Nicolas' Private Information. Plaintiffs have an interest in ensuring that their Private Information is reasonably

protected, and Defendant has demonstrated a pattern of failing to adequately safeguard this information.

478.    Due to Defendant's violations of the CCPA, as detailed herein, Plaintiffs seek statutory damages, injunctive or declaratory relief, and any other relief the Court deems proper.

479.    As described herein, an actual controversy has arisen and now exists as to whether Defendant implemented and maintained reasonable security procedures and practices appropriate to the nature of the information to protect the personal information under the CCPA.

480.    A judicial determination of this issue is necessary and appropriate at this time under the circumstances to prevent further data breaches by Defendant.

## COUNT V
## DECLARATORY JUDGMENT / INJUNCTIVE RELIEF
### (On Behalf of Plaintiffs and the Class)

481.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

482.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and state statutes described herein.

483.    Defendant owes a duty of care to Plaintiffs and Class Members, which required Defendant to adequately monitor and safeguard Plaintiffs' and Class Members' PII.

484.    Defendant and its officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns still possess the PII belonging to Plaintiffs and Class Members.

485.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class Members' PII and whether Defendant is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their PII. Plaintiffs alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiffs and the Class continue to suffer injury as a result of the compromise of their PII and the risk remains that further compromises of their private information will occur in the future.

486.    Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.  Defendant owes a legal duty to adequately secure the PII of Plaintiffs and the Class within its care, custody, and control under the common law, Section 5 of FTC Act, and the GLBA and its associated rules and regulations;

b.  Defendant breached its duty to Plaintiffs and the Class by allowing the Data Breach to occur;

c.  Defendant's existing data monitoring measures do not comply with its obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect the PII of Plaintiffs and the Class within Defendant's custody, care, and control; and

d.  Defendant's ongoing breaches of said duties continue to cause harm to Plaintiffs and the Class.

487.    This Court should also issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with industry standards to protect the PII of Plaintiffs and the Class within its custody, care, and control, including the following:

a. Order Defendant to provide lifetime credit monitoring and identity theft insurance and protection services to Plaintiffs and Class Members; and

b. Order that, to comply with Defendant's obligations and duties of care, Defendant must implement and maintain reasonable security and monitoring measures, including, but not limited to:

- Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems, networks, and servers on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

- Encrypting and anonymizing the existing PII within its servers, networks, and systems to the extent practicable, and purging all such information which is no longer reasonably necessary for Defendant to provide services to its employees or customers;

- Engaging third-party security auditors and internal personnel to run automated security monitoring;

- Auditing, testing, and training its security personnel regarding any new or modified procedures;

- Segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems, networks, and servers;

- Conducting regular database scanning and security checks; and

- Routinely and continually conducting internal training and education to inform Defendant's internal security personnel how

to identify and contain a breach when it occurs and what to do in response to a breach.

488.    If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach or cybersecurity incident. This risk is real, immediate, and substantial. If another data breach or cybersecurity incident occurs, Plaintiffs and the Class will not have an adequate remedy at law because monetary relief alone will not compensate Plaintiffs and the Class for the serious risks of future harm.

489.    The hardship to Plaintiffs and the Class if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Plaintiffs and the Class will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Defendant's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

490.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach or cybersecurity incident, thus preventing future injury to Plaintiffs and the Class and other persons whose PII would be further compromised.

## COUNT VI
### Violations of the North Carolina Deceptive and Unfair Trade Practices Act
### N.C. Gen. Stat. An. § 75-1.1, et. seq.
### (On Behalf of Plaintiff and the North Carolina Subclass)

491.    Plaintiff Dowell (for the purposes of this count, "Plaintiff") reincorporates by reference by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

492.     Plaintiff brings this claim on behalf of himself and the North Carolina Subclass (the "Class") for purposes of this count).

493.     Defendant's sale, advertising, and marketing of home loan services affected commerce, as meant by N.C. Gen. Stat. § 75-1.1.

494.     Defendants engaged in unlawful and unfair acts and practices, with respect to the sale and advertisement of the services paid for by Plaintiff and the Class Members, in violation of N.C. Gen. Stat. § 75-1.1, including by representing that Defendant would adequately protect Plaintiff's and the Class Members' Private Information from unauthorized disclosure and release, and comply with relevant state and federal privacy laws, including the following:

    a.   Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class Members' Private Information, which was a direct and proximate cause of the Data Breach;

    b.   Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    c.   Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and GLBA, which was a direct and proximate cause of the Data Breach;

    d.   Omitting, suppressing, and concealing the material fact that Defendant did not reasonably or adequately secure Plaintiff's and Class Members' Private Information; and

e.   Omitting, suppressing, and concealing the material fact that Defendant did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

495.   Defendant's inadequate data security had no countervailing benefit to consumers or to competition. Defendant intended to mislead Plaintiff and Class Members and induce them to rely on their misrepresentations and omissions. Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' Private Information.

496.   The above unfair practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous.

497.   Defendant knew or should have known that their network and data security practices were inadequate to safeguard Plaintiff's and the Class Members' Private Information entrusted to it, and that the risk of a data breach or theft was highly likely.

498.   Defendant's actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff and the Class Members.

499.   As a direct and proximate result of Defendant's unfair acts and practices, Plaintiff and the Class Members suffered an ascertainable loss of money or property, real or personal, as described above, including the loss of their legally protected interest in the confidentiality and privacy of their Private Information.

500.     Plaintiff and the Class Members seek relief under N.C. Gen. Stat. Ann. §§ 75-16 and 75-16.1, including, but not limited to injunctive relief, actual damages, treble damages, and attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)     For an order determining that this action is properly brought as a class action and certifying Plaintiffs as representatives of the Class and Plaintiffs' counsel as Class Counsel;

(b)     For an order declaring that Defendant's conduct violates the laws referenced herein;

(c)     For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d)     For damages in amounts to be determined by the Court and/or jury;

(e)     For an award of statutory damages or penalties to the extent available;

(f)     For pre-judgment interest on all amounts awarded;

(g)     For an order of restitution and all other forms of monetary relief; and

(h)     Such other and further relief as the Court deems necessary and appropriate.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

Dated: November 3, 2025                    Respectfully submitted,

                                           */s/ Terence R. Coates*
                                           Terence R. Coates (0085579)
                                           **MARKOVITS, STOCK & DEMARCO, LLC**
                                           119 East Court Street, Suite 530

Cincinnati, Ohio 45202
Telephone: (513) 651-3700
Facsimile: (513) 665-0219
*tcoates@msdlegal.com*

*Interim Class Counsel*
*for Plaintiffs and the Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 3, 2025, I served the foregoing upon counsel of record for all parties by filing it with the court's electronic-filing system in accordance with Fed. R. Civ. P. 5(b)(2)(E).

*/s/ Terence R. Coates*
Terence R. Coates (0085579)
